Ordie CONEY, Appellant,

v.

STATE of Alaska, Appellee.

Lloyd GRAHAM, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 7456, 7471.

Court of Appeals of Alaska.

May 17, 1985.

Christine Schleuss and Sen K. Tan, Asst. Public Defenders, and Dana Fabe, Public Defender, and Walter Share, Anchorage, for appellant Ordie Coney.

Linda R. MacLean and Phyllis A. Shepherd, Drathman, Weidner & Mysing, Anchorage, for appellant Lloyd Graham.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION

COATS, Judge.

Ordie Coney and Lloyd Graham were convicted of robbery in the first degree, AS 11.41.500(a)(1). Judge Daniel A. Moore, Jr. sentenced Coney, a third felony offender, to a presumptive term of fifteen years. Judge Moore sentenced Graham to twelve years with four suspended. Coney and Graham appeal to this court, raising several issues. We affirm but remand for further proceedings on one issue.

I. Discovery Issues.

Coney and Graham were convicted of robbing the Value Liquor Store on Jewel Lake Road in Anchorage. The state's theory of the case was that Coney, Graham and Harvey Lee Hunter had robbed the store at gunpoint. The state's case was primarily based on the testimony of Steven L. Greene, the clerk at the store at the time of the alleged robbery. Greene testified that Coney pulled out a gun, pointed it at Greene and said "this is a robbery." He testified Coney took cash from the register, a cash box and some liquor. After the co-defendants left the store, Greene called the police who pursued the car in which Coney, Graham and Hunter were attempting to escape. The police stopped the car and arrested the occupants.

At trial, the defense theory was that no robbery had taken place. Instead Greene had purchased cocaine from the co-defendants and Gladys Boyd. Greene had paid for the cocaine with liquor and cash from the till. According to the defense theory, Greene had reported the robbery in order to cover up his theft from the store.

A. Juvenile Record.

■ The defense sought discovery to bolster the contention that Greene reported the robbery to cover up for a cocaine transaction. In response to the prosecutor's request for a protective order, Coney and Graham sought Greene's juvenile record. Judge Moore viewed the juvenile record *in camera* and denied discovery, noting that Greene's juvenile record was more than five years old. Given the age and nature of Greene's juvenile adjudication, we believe that it is clear the former adjudication would have no relevance other than to impeach Greene's credibility.

Alaska Rule of Evidence 609 provides in pertinent part:

(a) *General Rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is only admissible if the crime involved dishonesty or false statement.

(b) *Time Limit.* Evidence of a conviction under this rule is inadmissible if a period of more than five years has elapsed since the date of the conviction.

900

The court may, however, allow evidence of the conviction of the witness other than the accused in a criminal case after more than five years have elapsed if the court is satisfied that admission in evidence is necessary for a fair determination of the case.

. . . .

(e) *Juvenile Adjudications.* The court may allow evidence of the juvenile adjudication of a witness if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence would substantially assist in determining the credibility of the witness.

■ Clearly under these rules Judge Moore had a great deal of discretion to determine that Greene's juvenile record was not discoverable. In addition, there is a state policy to limit the use of juvenile records and keep them private. *See* AS 47.10.080(g) and Alaska R. Children's P. 23. Given these considerations and our review of the record, we conclude that Judge Moore did not abuse his discretion in refusing to reveal Greene's juvenile record to the defense. However, we reaffirm our belief that where a juvenile record contains arguably admissible information, it should be turned over to the defendant so that its relevancy can be argued in an adversary setting. *Fox v. State,* 685 P.2d 1267, 1273 (Alaska App.1984).

B. ALPIN Printout.

■ During the defense case, Coney and Graham requested disclosure of Greene's Alaska Police Information Network (ALPIN) printout. An ALPIN printout is a report of all of a person's contacts with the police. After examining the ALPIN printout *in camera,* Judge Moore refused to require the prosecution to disclose its contents. We have reviewed the record. The ALPIN printout contains a number of abbreviations and the record does not disclose what the abbreviations mean. We therefore find it impossible to say that Greene's ALPIN printout was not discoverable. Given the defense in this case and Greene's

critical role in the prosecution, it appears to us that if Greene was a suspect in a case or had reported a crime, that this information, if developed, might lead to admissible evidence to attack his credibility. We therefore find it necessary to remand on this issue. The trial court should turn the ALPIN printout over to the defense attorneys to allow them to determine and argue its materiality.

C. The Andrew Ryan Matter.

■ Andrew Ryan, a reporter for the Anchorage Daily News, contacted Graham after his arrest. Ryan informed Graham that a police source had told Ryan that the police believed an employee of the Value Liquor Store on Jewel Lake Road was involved in drugs. The defense subpoenaed Ryan to testify. Ryan moved to quash the subpoena and for a protective order to prevent questions regarding his confidential police source. At a hearing held on Ryan's motion, Ryan testified that while he was riding in a police car, one of the police officers indicated that a clerk from the Jewel Lake Value Liquor Store was involved in drugs. Ryan claimed a reporter's privilege and refused to divulge the name of the police officer. At that time, he indicated this conversation had taken place a year prior to the August 11, 1982, hearing. Greene testified he had worked at the store "[a] little less than [two] months" before the robbery, which took place on November 25, 1981. Judge Moore agreed that the officer's name would be relevant to develop the defense theory.

Upon a positive answer to inquiry as to whether Ryan would refuse to reveal his source *in camera,* Judge Moore held Ryan in contempt. Confinement was stayed, pending Ryan's opportunity to appeal the decision.

At a hearing held subsequently before Judge Moore, Ryan testified that at the time the comment was made to him there was no snow on the ground. He further testified that the incident had taken place between April and the end of September, but most likely June or July of 1981. He

also said that there had been "construction going on in the area that was—it was warm sun—you know, it was relatively warm." Ryan maintained that Greene's name was not mentioned to him by the police officer. In particular, Ryan swore to the fact that the comment was not made in November of 1981.

Following Ryan's testimony at the second hearing, Judge Moore indicated his secretary had contacted the owner of the liquor store to determine Greene's initial date of employment. The information gathered by the secretary showed Greene was hired on November 6, 1981. Based upon that information, Judge Moore concluded the Ryan/police officer conversation had occurred prior to Greene's employment and thus granted Ryan's motion for a protective order over defense counsel's objection. Judge Moore said he would reconsider the matter and allow the defense to examine the Value Liquor Store owner and the store's records in a later hearing. Carroll R. Raney, the store owner, later testified he believed his wife hired Greene "around the first of November, 1st or 5th or 6th." Judge Moore later stated he relied on Raney's testimony that Greene had been hired November 6, 1981. He also referred to Court's Exhibit 1 which was Value Liquor's employment record for Greene.

Coney and Graham argue on appeal that a newspaper reporter's privilege is limited and must give way to more important constitutional values, such as a defendant's right to a fair trial. They argue that the police officer's identity was relevant to their defense. They claim that the information would have led to evidence that Greene was dealing drugs or that a clerk who worked before Greene was dealing drugs and was connected with the liquor store.

We assume, for purposes of this appeal, that Coney and Graham were entitled to have the court compel Ryan to reveal information which would be relevant to their defense. However, we believe that Judge Moore did not abuse his discretion in refusing to compel Ryan's testimony. It appears to us that Judge Moore could properly decide that the possibility of Ryan's testimony leading to information which would help the defense was remote. It was reasonable for Judge Moore to conclude that Ryan received the information during the summer of 1981 before Greene started to work for Value Liquor and therefore the information could not have applied to Greene. It was reasonable for Judge Moore to conclude that if the information applied to someone other than Greene, the possibility of this information helping the defense was remote. We therefore conclude that Judge Moore did not err in refusing to compel Ryan to testify.[1]

## II. Substituting the Alternate Juror.

On August 16, 1982, approximately two weeks into trial, juror Buss informed the court he had been offered a six-month job in Prudhoe Bay where he estimated he could make between fifty to sixty thousand dollars. Apparently, if juror Buss were not excused, the job would be given to someone else. Juror Buss indicated and Judge Moore agreed that the loss of such employment would amount to an "extreme hardship." In response to an inquiry about his ability to continue as a juror, after losing the job opportunity, juror Buss said:

I—I think I'd still be able to sit as a juror, but it's going to be awfully disappointing to see those dollar bill signs going flying by my eyes like that. You know. And you never know, the way things are today something might not come up for the rest of the winter.

No objections were made by defense counsel regarding the dismissal, nor to the

---

**1.** Coney and Graham argue that Judge Moore erred in relying on *ex parte* information in making his ruling on this point. It is clear that Judge Moore erred in making the *ex parte* contact with the owner of the liquor store to ascertain Greene's dates of employment. We conclude, however, that this error was harmless since Mr. Raney later testified in court on this matter and produced Greene's employment record.

finding that the loss of the job opportunity would amount to an extreme economic hardship on juror Buss. Coney and Graham were not present during the proceeding, but failed to object the following day when the court informed them an alternate juror would be seated. However, subsequently, Coney and his defense counsel at trial both filed affidavits which indicated that Coney was uninformed of the request by juror Buss, that Coney would have objected to juror Buss' dismissal, that Coney did not waive his right to be present at the proceeding, and that at the time of the proceeding Coney was being held in the basement of the courthouse.

Coney and Graham argue that it was error for Judge Moore to excuse the juror in their absence. They argue that this case should be reversed since, had they been present, they might have influenced Judge Moore's decision to excuse juror Buss.

*Huff v. State*, 598 P.2d 928 (Alaska 1979), is the starting point for our analysis. In *Huff* the trial judge excused a juror in the absence of both the defendant and his counsel. The trial judge excused the juror because the juror's husband, who was ill with emphysema, was in the intensive care unit of the hospital and the juror needed to be with him. *Id.* at 931. The supreme court held that the trial judge did not commit reversible error in excusing the juror.

Coney and Graham point out that *Huff* involved a more compelling reason for excusing the juror than in the instant case. They point to the numerous Alaska decisions requiring the presence of the defendant during trial proceedings and stress that the supreme court "has found reversible error in situations where the defendant's presence could have had an impact on the decisional process." *State v. Hannagan*, 559 P.2d 1059, 1065–66 n. 20 (Alaska 1977); Alaska R.Crim.P. 38(a). From our review of the cases, we conclude that it was error for Judge Moore to excuse juror Buss in the absence of Coney and Graham. This was not an emergency situation comparable to the situation in *Huff.* There is nothing in the record to indicate that Coney and

Graham could not have been brought back to court. Thus, Coney's and Graham's convictions must be reversed unless we can find that the error was harmless beyond a reasonable doubt. *Id.* at 1065–66.

In deciding whether there was harmless error we have turned to 2 Wright, *Federal Practice and Procedure*, § 388 (1969), which the supreme court relied on in deciding the *Huff* case. 598 P.2d at 932. Wright states:

> Alternate jurors, in the order in which they were called, replace jurors who become or are found to be unable or disqualified to perform their duties. The substitution of an alternate for a juror for reasonable cause is within the prerogative of the trial court and does not require the consent of any party. The court has discretion in deciding when to make such a substitution. It also has discretion in the procedure to be used to ascertain whether a substitution should be made. Every effort should be made to give defendant and his counsel an opportunity to be heard before making such a substitution, but absent a showing of prejudice, reversal is not required for failure to do so.
>
> Defendant is entitled to a new trial because of the substitution of an alternate juror only if he can demonstrate that he was prejudiced by the substitution. It is difficult to believe that this showing can ever be made, especially since it is not enough that the juror who was excused was thought by the defendant to be biased in his favor. [Footnotes omitted.]

Wright's summary seems to accurately reflect the holdings of the federal courts. *See United States v. Dumas*, 658 F.2d 411, 413–14 (5th Cir.1981), *cert. denied*, 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982); *United States v. Dominguez*, 615 F.2d 1093, 1095–96 (5th Cir.1980); *United States v. Houlihan*, 332 F.2d 8, 13 (2d Cir.1964). We note that these federal cases are cases where neither the defendant nor his counsel were able to participate in the decision to excuse a juror and seat an alternate.

Given the strong stand which our supreme court has taken in requiring the presence of the defendant at all stages of trial and the fact that the supreme court has been reluctant to find harmless error where any portion of the trial has been conducted without the defendant, we think it is unlikely that the Alaska Supreme Court would be as inclined as the federal courts to find harmless error in such a situation. However, in the instant case, the co-defendants' counsel were present to represent their interests. Judge Moore had a legitimate reason to dismiss the juror. Had Judge Moore required the juror to sit, it would have been an economic hardship for him. Thus, Judge Moore could properly have concluded that the juror would have had trouble giving his full attention to the case. It seems highly unlikely that Judge Moore would have reached a different decision had Coney and Graham been present. Furthermore, there is no reason to believe that the result of the trial would have been different if juror Buss had been present for deliberation instead of the alternate. Coney and Graham were tried by an impartial jury. We find that the error was harmless beyond a reasonable doubt.

### III. The Prosecutorial Reference to Custody.

■ During the cross-examination of the defense witness, Daniel "Candy" Evans, the prosecutor asked Evans whether he was currently in custody. Evans replied that he was. Coney's counsel requested a mistrial. Judge Moore refused to grant the mistrial motion but did instruct the jury to disregard the testimony.

In *Roth v. State*, 626 P.2d 583, 585 (Alaska App.1981), we explained that the decision to grant a mistrial is left to the sound discretion of the trial court and will be overturned only when clearly erroneous. The *Roth* opinion reads in part:

> The trial judge has the opportunity to observe the tainted evidence in the context in which it is received by the jury. He, far better than we, can tell whether substantial prejudice has been done....

*See Anderson v. State*, 438 P.2d 228, 232–33 n. 15 (Alaska 1968) citing the general rule that "where the trial judge withdraws improper testimony from the jury's consideration, such an instruction is presumed to cure any error which may have been committed by its introduction."

We have reviewed the record and conclude Judge Moore did not err in refusing to grant the mistrial motion. Evans admitted at trial that he was a thief and a hustler. He also admitted four prior convictions for receiving stolen property, one for which he was sentenced to five years imprisonment. We conclude that the additional admission by Evans that he was in custody would have had little impact on the jury and that a mistrial was not required.

### IV. Jury Instruction No. 4.

■ Instruction No. 4 was read to the jury over defense objection. In part the instruction reads:

> A witness deliberately lying in one material part of his testimony may be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you should believe the *probability of truth* favors his testimony in other particulars. [Emphasis supplied.]

Coney and Graham argue that the instruction was erroneous because it diluted the prosecution's burden of proof necessary to convict them. They contend that at trial they established that the primary prosecution witness, Steven L. Greene, deliberately lied about material portions of his testimony. They argue that the jurors could have read the instruction to require the jury to believe Greene, even though he lied, if they believed his testimony was probably true. They contend that the jury might then have voted to convict, based on this instruction, if they found Greene's testimony was probably true rather than applying the proper standard of whether the state had proven that Coney and Graham were guilty beyond a reasonable doubt.

We disapprove of the instruction. Alaska Pattern Jury Instruction 1.06 states in part:

> If you believe that a witness testified falsely as to part of his testimony, you may choose to distrust other parts also, but you are not required to do so.

This seems to us to be a preferable instruction. However, we believe that the instructions which Judge Moore gave, taken as a whole, told the jury that they could only convict if the state proved guilt beyond a reasonable doubt. Instruction No. 4 does not tell the jury to convict on a standard of less than the constitutional "beyond a reasonable doubt" standard. Three other instructions which Judge Moore gave clearly and unequivocally instructed the jury on the proper standard. We therefore find the error harmless.

The convictions are AFFIRMED and the case is REMANDED for further proceedings consistent with this opinion.